# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Carlos Hilario Arias; Vicente Cisneros Abonce, both individually and as "next friend for his minor children, E.C.A., V.C.A., Jr., and J.C.A.; Dulce Maria Hernandez Arias; Rosa De Jesus Barrajas Arrellano; Graciela Barragan, both individually and as "next friend" for her minor child, J.A.P.; Jose Manuel Ramirez Calix; Alejandro Cartagena; William Ramos Castillo; Fabiola Cisneros; Rosa Nely Duarte; Esau Eduardo Estrada-Menendez; L.G., both individually and as "next friend" for her minor child, A.G.; Francis Garcia, both individually and as "next friend" for her minor child, O.B.; Teresa De Jesus Guerrero; Wenscelao Padilla Guzman; Troy Hastings, both individually and as "next friend" for his minor child, B.H.; Joceline Sarai Lopez, both individually and as "next friend" for her minor child, J.M.; Rosa Sorto Lopez; Ana Danira Maldonado-Hernandez; Iris Janet Maldonado, both individually and as "next friend" for her three minor children, P.M., B.M., and E.M..; Jenny Maldonado, both individually and as "next friend" for her minor child, S.D.M.; Ermencia Mendez; Audrey Mithun; Barbara Anahi Moreno; Javier Moreno; Josefa C. Montalvo, both individually and as "next friend" to her minor grandchild, B.M.; Albis Muñoz; Francisco Muñoz, both individually and as "next friend" for one minor child, I.M.; Juan Muñoz; Saomara Muñoz; Manuela De Jesus Pineda; Jaime Reyes, both individually and as "next friend" for his two minor children, D.R.B. and J.R.B.; Marlen Alonso Soriano; Alex Josue Sorto; Andres Mendendez Vega; Raul Veliz, Jr.; Digna Munoz Xiomara; Jorge Zelaya; Samuel Zelaya; and Jose Erasmo Montalvan, the Consul of Honduras, as "next friend" to Honduran Nationals,

        Plaintiffs,[1]

v.

**MEMORANDUM OPINION AND ORDER**

---

[1] Although certain Plaintiffs have been dismissed from the case, the caption still reflects their status as Plaintiffs.

|  | Civ. No. 07-1959 ADM/JSM |

United States Immigration and Customs Enforcement
Division of the Department of Homeland Security;
United States Department of Homeland Security;
Michael Chertoff, Secretary of Department of
Homeland Security; Julie L. Myers, Assistant
Secretary of Homeland Security for Immigration and
Customs Enforcement; John P. Torres, Director of
Detention and Removal Operations, Immigration and
Customs Enforcement; Scott Baniecke, St. Paul Field
Office Director for Detention and Removal Operation;
Peter Berg, Supervisory Detention & Deportation
Officer, Detention and Removal; John Doe ICE Agents
##1-30; James A. Kulset, Willmar Police Department
Chief of Police; John Doe Willmar Police Officers
##1-10; Reed Schmidt, Atwater Police Department
Chief of Police; Paul Schmidt, Atwater Police Officer;
Dan Hartog, Kandiyohi County Sheriff; John Doe
Kandiyhoi County Sheriff's Deputies ##1-10; Jane Doe
Kandiyohi County Probation Official,

     Defendants.[2]

_____

Jennifer R. Coates, Esq., Gray Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, argued on behalf of Plaintiffs.

Lonnie F. Bryan, Esq., Assistant United States Attorney, Minneapolis, MN, argued on behalf of Defendants Julie L. Myers, John P. Torres, Scott Baniecke, Peter Berg, Allen Gay, and John Doe ICE Agents ##1-30.

Jon K. Iverson, Esq., Iverson Reuvers, LLC, Bloomington, MN, argued on behalf of James A. Kulset, John Doe Willmar Police Officers ##1-10, Reed Schmidt, and Paul Schmidt.

_____

## I. INTRODUCTION

On June 23, 2009, the undersigned United States District Judge heard oral argument on

the Motion by Defendants Peter Berg ("Berg"), Allen Gay ("Gay"), Julie L. Myers ("Myers"),

---

[2] Although certain Defendants have been dismissed from the case, the caption still reflects their status as Defendants.

John P. Torres ("Torres"), Scott R. Baniecke ("Baniecke") and John Doe ICE Agents ##1-30 (collectively the "Federal Defendants") for Summary Judgment and Dismissal [Docket No. 187] and the Motion by Defendants James A. Kulset ("Kulset"), Reed Schmidt ("Chief Schmidt"), Paul Schmidt ("Officer Schmidt") (collectively the "Schmidts"), and John Doe Willmar Police Officers ##1-10 (collectively the "Willmar/Atwater Defendants") for Summary Judgment [Docket No. 189]. This case arises from actions taken by Defendants during "Operation Crosscheck," an immigration enforcement effort that occurred in Willmar, Minnesota from April 10-14, 2007. Operation Crosscheck was conducted by members of Immigration and Customs Enforcement ("ICE") and local and county law enforcement. At its inception, the suit was brought by 56 plaintiffs against a number of defendants. Currently only three plaintiffs, Graciela Barragan Cardenas[3] ("Cardenas"), her minor son, J.A.P., and Raul Veliz ("Veliz") (collectively "Plaintiffs"), remain. For the reasons set forth below, the Federal Defendants' Motion is granted in part and denied in part, and the Willmar/Atwater Defendants' Motion is granted.

## II. BACKGROUND[4]

Plaintiffs allege that Defendants violated their Fourth Amendment rights during two separate incidents. In the first incident, Veliz alleges that he was illegally stopped by ICE agents and a Willmar undercover police officer. 2d Am. Compl. [Docket No. 102] ¶ 113. The second incident occurred when ICE agents and other law enforcement officers entered the Cardenas home without a warrant or her consent. Id. ¶ 98.

---

[3] Cardenas has married since the Complaint was filed and has taken her husband's name.

[4] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

**A.     The Veliz Incident**

On April 12, 2007, at 7:00 a.m., Veliz left his residence in his car when he saw a number of white SUVs with eagles painted on them in the street. Federal Defendants Exhibits [Docket No. 199] Ex. 49 (Veliz Dep.) at 26. He passed the vehicles to go to his mother's house to get money so he could purchase breakfast for her. Id. at 29. After leaving his mother's house, he saw the vehicles again, and one of the drivers signaled to Veliz to take the right of way and turn. Id. at 32. The lead vehicle then pulled behind Veliz, turned on its lights, and stopped Veliz. Id. at 35. Another vehicle pulled in front of Veliz to block his exit. Id. at 50. Veliz recognized the driver of the second car as a local law enforcement officer. Id. at 11. The law enforcement officers got out of their cars and approached Veliz. Id at 52.

An officer asked Veliz to provide identification, and Veliz gave the officer his Minnesota driver's license. Id. The officer did not immediately verify Veliz's identity and stated that he believed Veliz was from Mexico. Id. at 53. Veliz stated that he was originally from Texas, and the officer told him to prove it by naming all the schools he attended and the names of his principals and teachers. Id. at 21. The officer also asked Veliz to provide a birth certificate and social security card. Id. at 55. Veliz heard an ICE agent tell a local police officer to run Veliz's record in the hopes of finding "something" that would allow them to "take him in." Id. at 19-20. The officer found that Veliz had an outstanding repair ticket that required Veliz to prove that he had removed tinting from his car windows. Id. at 93-94. Apparently, the officers were satisfied that Veliz had removed the tinting, released him with a warning, and he was not taken into custody. Id. at 67-68, 94. The duration of the stop and questioning of Veliz was approximately fifteen to twenty minutes. Id. at 41, 64, 98.

4

**B.	The Cardenas Incident**

At 10:15 a..m. on April 13, 2007, Cardenas woke up to the sound of loud knocking, the doorbell ringing, men yelling, and banging on the windows.  Federal Defendant Ex. 44 (Cardenas Dep.) at 15-16.  Cardenas looked out of her windows and saw men in black clothing surrounding her house.  Id. at 17.  The noise awoke her son J.A.P., age six, who began crying.  Cardenas put J.A.P. in the bathroom with the family dog.  Id. at 18-19.  After leaving the bathroom, she heard voices in the house and then entered the living room where five armed men were present.  Id. at 24.  Cardenas asked the men what they wanted, and they told her they were police officers with arrest warrants.  Id. at 25-26.  The officers asked repeatedly for permission to search the home, and Cardenas repeatedly denied these requests.  Id. at 40-43.

Cardenas alleges that the officers became aggressive, commented on her tattoos, threatened her with arrest, and falsely stated that her fiancé gave them permission to search.  Id. at 41-46. Officer Schmidt arrived about fifteen minutes into the incident; his father, Chief Schmidt, did not arrive until the conclusion of the incident.  Id. at 87, 90.  The officers left Cardenas's home after approximately 45 minutes of requesting consent to search.  J.A.P. remained in the bathroom for the entire time the officers were there.  Id. at 48.  Cardenas never gave the officers permission to enter her home.  Id. at 21.

### III.  DISCUSSION

**A.	Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

5

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     The Doe Defendants**

There are 40 John Doe Defendants remaining in this case. "When, as here, a party is ignorant of defendants' true identit[ies], it is unnecessary to name them until their identity can be learned through discovery." Maclin v. Paulson, 627 F.2d 83, 87 (7th Cir. 1980). However, "the Doe fiction may only be used until such time as the actual identities can be learned." Kemper Ins. Cos. Inc. v. Federal Express Corp., 115 F. Supp. 2d 116, 125 (D. Mass. 2000). Plaintiffs have had over two years since the filing of the Complaint to conduct discovery and serve interrogatories to determine the identities of the Doe Defendants. See Pretrial Scheduling Order [Docket No. 129]. Defendants responded to Plaintiffs interrogatories, providing the names of the individual officers and agents, and Plaintiffs moved to amend their Complaint. See Mot. to Am. Compl. [Docket No. 130]. In that Motion, Plaintiffs requested leave to add a class of plaintiffs to challenge the pattern and practice of some Defendants but did not seek leave to replace the Doe Defendants with the names of actual officers. Mem. in Supp. of Mot. to Am. Compl. [Docket No. 132]. Because Plaintiffs have failed to identify the Doe Defendants, even though they had access to this information at the close of Phase I discovery, these Defendants are dismissed.

6

C.  **Qualified Immunity**

The remaining Defendants argue that they are entitled to qualified immunity on Plaintiffs Fourth Amendment claims. The doctrine of qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A court must determine both whether the defendant violated a constitutional right and if that right was clearly established. Pearson v. Callahan, 129 S. Ct. 808, 816, 818 (2009). To determine whether a particular right was clearly established, it must be viewed in a particularized, relevant sense: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 639-40 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law." Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994). "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action." Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001).

1.  **Immunity for Berg, Myers, Torres, Baniecke, & Kulset**

A supervisor may not be held liable for the constitutional violations of a subordinate under a respondeat superior theory. Boyd v. Knox, 46 F.3d 966, 968 (8th Cir. 1995). A supervisor is only liable when "he directly participates in a constitutional violation or if a failure

7

to properly supervise and train the employee caused a deprivation of constitutional rights." Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996). Each "Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).

At the time of Operation Crosscheck, Berg was a Supervisory Detention and Deportation Officer in ICE's St. Paul, Minnesota office and was a supervisor charged with implementing Operation Crosscheck. Federal Defendants Ex. 41 (Berg Dep.) at 8. Berg was not present during the incident at Cardenas's house or the stop of Veliz's vehicle. See id. at 97-100; Ex. 42 (Gay Dep.) at 99. Myers is Assistant Secretary for the Department of Homeland Security, U.S. Immigration and Customs Enforcement and the highest ranking ICE official. Myers Aff. [Docket No. 71] ¶ I. Myers had no personal involvement with any Plaintiff. Id. ¶ III. Torres is Director for Detention and Removal Operations for ICE and in that capacity has supervisory authority over detention and removal actions. Torres Aff. [Docket No. 72] ¶¶ I, IV. Torres also had no personal involvement with any Plaintiff. Id. ¶ II. Baniecke is Field Office Director for ICE in St. Paul and was responsible for ensuring that Operation Crosscheck, a national program, was implemented in Willmar according to protocol. Baniecke Aff. [Docket No. 73] ¶ II. He, too, had no direct contact with Plaintiffs. Id. ¶ III. Kulset is Chief of Police for the City of Willmar and was not present during either incident at issue. Kulset Aff. [Docket No. 192] ¶¶ 1, 3. Because none of these five Defendants was present or engaged in the alleged misconduct, they are entitled to qualified immunity.

### 2. Immunity for Officer Schmidt and Chief Schmidt

Neither Officer Schmidt nor Chief Schmidt was present during the vehicle stop of Veliz.[5] Both officers were present, however, at the Cardenas residence. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (quoting Groh v. Ramirez, 540 U.S. 551, 559 (2004)) (internal quotations omitted). There are, however, exceptions to this rule including "situations in which voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (citation omitted). For purposes of qualified immunity, it is clearly established that officers violate the Fourth Amendment when they enter a home without a warrant absent consent or exigent circumstances. Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998).

The Schmidts do not claim they received consent or exigent circumstances existed. Rather, they argue that they entered the house after the ICE agents had already gained entry,

---

[5] Veliz, Cardenas, and J.A.P. were not targets of Operation Crosscheck. The majority of the Equal Protection Claims challenge the design and implementation of Operation Crosscheck. Veliz alleges that he was targeted on account of his race, and so states a cognizable Equal Protection Claim. However because the Schmidts were not involved in the Veliz stop, the Schmidts are entitled to summary judgment on that claim.

were unaware that Cardenas had not given her consent, and, therefore, it was reasonable for them to assume, upon arriving at a house in which law enforcement officers were already present, that the officers had lawfully gained entry. It is undisputed that both Schmidts arrived well after law enforcement had entered Cardenas's house. Cardenas Dep. at 87, 90. Additionally neither Schmidt was aware of how the ICE agents gained entry into the home or heard if Cardenas granted or denied consent to enter. Reed Schmidt Aff. [Docket No. 195] ¶¶ 5, 6; Paul Schmidt Aff. [Docket No. 196] ¶¶ 5-7.

To satisfy the "reasonableness" requirement of the Fourth Amendment "what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." Rodriguez, 497 U.S. at 185. This situation is analogous to the facts in Groh. In Groh, the line officers entered the premises of the defendant based on the erroneous belief that the team leader had obtained a valid warrant. 540 U.S. at 556. The Court found that it was reasonable for the officers to rely on their superior officer and did not need to examine the warrant themselves. Id. (citing Ramirez v. Butte-Silver Bow County, 298 F.3d 1022, 1028 (9th Cir. 2002)). In the instant case, it was reasonable for the Schmidts, arriving at the Cardenas residence after ICE agents were already inside and having no indication Cardenas had not provided consent, to believe that they were entering the property lawfully.[6] The Willmar/Atwater Defendants' Motion for Summary Judgment is granted.

---

[6] Because Cardenas does not allege any facts that would create a cognizable Equal Protection violation, summary judgment is appropriate on that claim as well. See n.5.

### 3. Immunity for Gay

Gay argues that he is entitled to immunity for the Veliz incident because he did not participate in the alleged illegal stop. The Court agrees. While Gay was a member of the caravan that was present before Veliz was stopped, he did not personally stop Veliz. Federal Defendants Ex. 42 (Gay Dep.) at 95. At the time when Veliz was stopped by ICE agents,[7] Gay was attempting to serve an arrest warrant at a target address. Id. at 94. There is no indication that Gay was involved in the alleged illegal stop.

Gay next argues that he is entitled to immunity for the Cardenas incident because, although he was present, he was not personally involved in the alleged unconstitutional conduct. Gay testified that when he arrived at the Cardenas residence, he received a phone call. Id. at 98. Because of this phone call, he does not believe he knocked on Cardenas's door, but cannot recall with certainty. Id. However, even if Gay did not knock on the door or was not the first person to ask Cardenas for consent to enter the home, he testified that Cardenas gave him consent to enter her home. Id. at 98, 149. Cardenas disputes that she gave consent to anyone to enter her home. Cardenas Dep. at 21. Gay cannot rest on a qualified immunity defense based on a reasonable reliance theory similar to the Schmidts because his testimony that he received consent shows his direct involvement with the alleged illegal entry. The testimony was that he did not enter the house after other agents had already gained entry, but rather because of Cardenas's consent.

---

[7] Gay testified that Veliz was not stopped by law enforcement, but rather followed the law enforcement vehicles around the trailer park and stopped of his own volition. Gay Dep. at 94. Because Gay has moved for summary judgment, the Court takes the facts in the light most favorable to Veliz and assumes he was stopped by ICE agents for purposes of this motion only.

Cardenas's contrary testimony creates a question of fact for the jury.[8]

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants James A. Kulset, Reed Schmidt, Paul Schmidt, and John Doe Willmar Police Officers ##1-10's Motion for Summary Judgment [Docket No. 189] is **GRANTED**;

2. Defendants Peter Berg, Allen, Gay, Julie L. Myers, John P. Torres, Scott R. Baniecke and John Doe ICE Agents ##1-30's Motion for Summary Judgment and Dismissal [Docket No. 187] is **GRANTED IN PART** and **DENIED IN PART**; and

3. The sole remaining claim is Plaintiffs Graciela Barragan (Cardenas) and J.A.P.'s alleged illegal entry claim against Defendant Allen Gay.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: July 17, 2009.

---

[8] Because Cardenas does not allege any facts that would create a cognizable Equal Protection violation, however, summary judgment is appropriate for Gay on that claim. See nn.5, 6.